**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW MEXICO**

UNITED STATES OF AMERICA,

        Plaintiff,

                                       No. 18-CR-3126 MV

    v.

FRANCISCO GONZALES,

        Defendant.

**MEMORANDUM OPINION AND ORDER**

**THIS MATTER** is before the Court on the sentencing of Defendant Francisco Gonzales. On September 11, 2019, he pled guilty to an Information charging him with Felon in Possession of a Firearm, in violation of 18 U.S.C. § 922(g)(1).  Doc. 34, Doc. 37 at ¶ 3.  He came before the Court for sentencing on January 21, 2021.  Doc. 67.  After carefully considering the parties' legal arguments, the Court determined that Mr. Gonzales had at least three prior convictions for a violent felony that were committed on different occasions.  *Id.*  Accordingly, he was subject to an enhanced sentence under the Armed Career Criminal Act (ACCA) requiring no less than fifteen years of imprisonment.  *Id.*; 18 U.S.C. § 924(e).  The Court sentenced Mr. Gonzales to the 15-year mandatory minimum and imposed two years of supervised release.  Doc. 67.

Although the Court explained its sentence in depth at Mr. Gonzales's sentencing hearing, this memorandum opinion and order will provide the Court's complete analysis of the parties' legal arguments regarding the applicability of the ACCA, the 18 U.S.C. § 3553(a) factors, and the mitigating factors in this case that would warrant a downward variance from the advisory range of imprisonment recommended in this case by the United States Sentencing Guidelines if the ACCA's mandatory minimum sentence was inapplicable.

1

## DISCUSSION

Francisco Gonzales is before the Court for sentencing in case number 18-CR-3126. Pursuant to *United States v. Booker*, 543 U.S. 220 (2005), this Court must consider the advisory United States Sentencing Guidelines as well as each of the additional factors stated in 18 U.S.C. § 3553(a) in imposing a reasonable sentence that is sufficient, but not greater than necessary, to comply with the purposes set forth in § 3553(a).

Mr. Gonzales pled guilty to Count 1 of a one-count indictment charging him with Felon in Possession of a Firearm, in violation of 18 U.S.C. §§ 922(g)(1) and 924.  Doc. 34, Doc. 37 at ¶ 3. He accepts responsibility.

The United States Probation Office prepared a Presentence Investigation Report (PSR) in this case.  The Court adopts its factual findings.

Mr. Gonzales makes one objection to the PSR.  He objects to the PSR's determination that he "has at least three prior convictions for a violent felony or serious drug offense, or both, which were committed on different occasions," thus deeming him an armed career criminal subject to an enhanced sentence under 18 U.S.C. § 924(e).  Doc. 43 at 1.  Mr. Gonzales argues that the PSR did not identify which prior convictions qualify him as an armed career criminal, and he asserts that he does not have three predicate convictions under the ACCA.  *Id.* at 2.  He argues that Subsection (C) of the New Mexico Aggravated Battery statute does not necessarily meet the definition of a violent felony and that the Subsection's language is ambiguous, in violation of Due Process.  *Id.* at 4–5; Doc. 56 at 3–5.

Under 18 U.S.C. § 924(e), a person who violates § 922(g) and has three previous convictions for a "violent felony or a serious drug offense" that were committed on different occasions must be fined and imprisoned for not less than fifteen years.  18 U.S.C. § 924(e)(1).  A

violent felony under this section is a crime punishable by imprisonment for a term exceeding one year that has an element of the use, attempted use, or threatened use of physical force against the person of another.  18 U.S.C. § 924(e)(2)(B).

Mr. Gonzales has never been convicted of any drug offense.  Doc. 43 at 2.  He concedes that he does have two prior convictions for offenses that meet the criteria for a "violent felony" as that term is used in 18 U.S.C. § 924(e).  *Id.*  On June 22, 2004, Mr. Gonzales was convicted of, among other things, two counts of Aggravated Assault with a Deadly Weapon pursuant to N.M. Stat. Ann. § 30-3-2(A).  *Id.* at 2–3.  One count is from an incident on April 13, 2002, when Mr. Gonzales struck R.F. in the face multiple times with his fist and later that day pointed a revolver at multiple people outside of R.F.'s home.  Doc. 41 at ¶ 51.  The other count is from an incident on September 21, 2002, when he was asked to leave a residence following an argument with his girlfriend.  *Id.* at ¶ 52.  Mr. Gonzales then drove his vehicle into the residence through the living room, nearly hitting R.H.  *Id.*  When approached by law enforcement officers, he pointed a boxcutter at them and then placed it at his own throat, threatening suicide.  *Id.*  These cases were consolidated, and he was found guilty of Aggravated Assault (Deadly Weapon) (Firearm Enhancement) and Aggravated Assault (Deadly Weapon).  He was sentenced to nine years less one day.  *Id.*  Mr. Gonzales acknowledges that the Tenth Circuit has consistently held that New Mexico Aggravated Assault with a Deadly Weapon is categorically a violent felony under the ACCA elements clause.  Doc. 43 at 3.  Although these convictions were pled together and he was given a single sentence in a single judgment, the two convictions were for violent felonies that were committed on different dates and accordingly meet the definition of predicate violent felony convictions.

However, Mr. Gonzales contests whether there is a third conviction that meets the required

definition of "violent felony."  Mr. Gonzales initially argued that the PSR does not identify which prior conviction would make him an armed career criminal and further argued that the PSR did not list sufficient information regarding the conviction for "Aggravated Battery" to establish it as a conviction meeting the definition of "violent felony" under 18 U.S.C. § 924(e).  Doc. 43 at 4. Mr. Gonzales's Form 13 PSR and post–plea agreement PSR each identify the three convictions for violent felony offenses that would qualify Mr. Gonzales as an armed career criminal.   In addition to his two counts of Aggravated Assault (Deadly Weapon) from 2004, paragraph 21 of the Form 13 PSR and paragraph 24 of the post-plea PSR identify his 1996 Aggravated Battery conviction as a predicate conviction.  Doc. 26 at ¶ 21; Doc. 41 at ¶ 24.   However, Mr. Gonzales's Form 13 PSR and post–plea agreement PSR incorrectly listed his prior 1996 conviction as simply "Aggravated Battery" pursuant to N.M. Stat. Ann. § 30-3-5.  Mr. Gonzales asserts that the New Mexico aggravated battery conviction is not necessarily a violent felony because a person can be convicted without employing the violent force required under *Johnson v. United States*, 559 U.S. 133, 140 (2010) ("*Johnson I*") (holding that an offense must have an element that requires proof of violent physical force).  Doc. 43 at 5–6.  He asserts that there must be "specific proof with recognized documentation that [he] was convicted of a violent felony."  *Id.* at 6.  Mr. Gonzales also notes that the PSR did not mention whether he had legal representation for that conviction. *Id.* at 6–7.  He asserts that none of his other prior convictions meet the requirements of a "violent felony" under the ACCA.  *Id.* at 8.

Following Mr. Gonzales's objection, Probation filed the First Addendum to the PSR to clarify the "Aggravated Battery" conviction.  Doc. 46.  Probation acknowledged that the PSR did not list sufficient information to establish it as a conviction meeting the definition of "violent felony" under 18 U.S.C. § 924(e).  Doc. 46 at 1–2.  Probation explains that Mr. Gonzales's 1996

conviction was incorrectly listed: he was not convicted of "Aggravated Battery," but of "Aggravated Battery with a Deadly Weapon." *Id.* The grand jury indictment states that on January 9, 1995, Mr. Gonzales "did touch or apply force to L.C., with an exacto knife, a deadly weapon, intending to injure L.C. or another, contrary to Sec. 30-3-5 (A) & (C), NMSA 1987, as amended. The Judgment and Order, dated July 22, 1996, indicates the defendant was represented by counsel, Leonard Foster." *Id.* at 2.

Mr. Gonzales's argument that his 1996 conviction for aggravated battery is not necessarily a violent felony is undermined by probation's specific proof with recognized documentation that Mr. Gonzales was convicted of Aggravated Battery with a Deadly Weapon, which the Tenth Circuit has held is a violent felony. *See United States v. Manzanares*, 956 F.3d 1220, 1228 (10th Cir. 2020); *United States v. Ybarra*, 827 F. App'x 896, 899 (10th Cir. 2020); *United States v. Maldonado-Palma*, 839 F.3d 1244, 1250 (10th Cir. 2016). To determine whether a prior conviction qualifies under the ACCA, the sentencing court applies the categorical approach and looks at only the elements of the statute under which the defendant was convicted. *Johnson v. United States*, 576 U.S. 591, 595 (2015) ("*Johnson II*"). In cases where a particular offense contains multiple elements listed in the alternative, a sentencing court employs the modified categorical approach and may examine a limited set of materials to determine which alternative elements formed the basis of the defendant's conviction. *Mathis v. United States*, 136 S. Ct. 2243, 2249 (2016). Under *Shepard v. United States*, a sentencing court trying to determine whether a defendant pled guilty to an ACCA-qualifying offense may look only to "the terms of the charging document, the terms of a plea agreement or transcript of colloquy between judge and defendant in which the factual basis for the plea was confirmed by the defendant, or to some comparable judicial record of this information." 544 U.S. 13, 25–26 (2005).

Here, the modified categorical approach is used because New Mexico's Aggravated Battery statute § 30-3-5 contains multiple elements listed in the alternative. Elements are the "constituent parts" of a crime's legal definition, or the things prosecution must prove to sustain a conviction; means are different ways in which an individual can commit the elements of a crime. *Mathis*, 136 S. Ct. at 2248. In N.M. Stat. Ann. § 30-3-5 the alternative elements are subsections (B), a misdemeanor, and (C), a third-degree felony. Probation provided underlying documents— the indictment, plea agreement, and judgment—that are acceptable under *Shepard* to sufficiently establish that Mr. Gonzales was convicted of a felony under § 30-3-5(C), which is the "deadly weapon" version of battery under the statute. Doc. 46-1 at 1–6.

Mr. Gonzales further argues that Subsection (C) of the New Mexico Aggravated Battery law does not meet the definition of a violent felony because the statute contains "vague" language. Mr. Gonzales asserts that the language of the statute is vague because it states "*in any manner whereby great bodily harm or death can be inflicted.*" Doc. 56 at 3 (citing N.M. Stat. Ann. § 30-3-5(C) (emphasis added by Mr. Gonzales)). He argues that this language is comparable to the vague language of the residual clause of the Armed Career Criminal statute invalidated by the Supreme Court in *Johnson II*. *Id.* at 3–4 (citing *Johnson II*, 576 U.S. at 594). Mr. Gonzales contends that it is not constitutional to find his prior conviction is a violent felony under the New Mexico statute's language, and he urges the Court to "deny the request of the Government and probation to find Mr. Gonzales an Armed Career Criminal." *Id*. at 4–5.

However, the Tenth Circuit has expressly held that a conviction under New Mexico Aggravated Battery § 30-3-5(C) *is* a violent felony under the ACCA. In *United States v. Manzanares*, the Tenth Circuit held that a conviction for aggravated battery under § 30-3-5(C) *necessarily* requires *Johnson I*-level force. 956 F.3d at 1228. Other Tenth Circuit cases, including

the unpublished *United States v. Baker* and *United States v. Sanchez* opinions, affirm that using a deadly weapon to commit aggravated battery is necessarily a violent felony. *United States v. Baker*, 748 F. App'x 807, 813 (10th Cir. 2018) (unpublished); *United States v. Sanchez*, 748 F. App'x 801, 806 (10th Cir. 2018), *cert. denied*, 139 S. Ct. 2011, 204 L. Ed. 2d 219 (2019). In *Baker*, the Tenth Circuit held that a conviction under § 30-3-5(C) is a violent felony under the ACCA, stating:

> [R]easonable jurists could not debate that aggravated battery with a deadly weapon under N.M. Stat. Ann. § 30-3-5(A), (C) 'has as an element the use, attempted use, or threatened use of physical force against the person of another,' and thus serves as a [] prior violent felony conviction for sentencing enhancement under ACCA.

748 F. App'x at 813.

Mr. Gonzales argues that the *Manzanares* Court did not consider the ambiguous language issue. Doc. 60 at 10. Nevertheless, the Tenth Circuit has already held that a conviction for aggravated battery under § 30-3-5(C) is a violent felony. *See United States v. Ybarra*, 827 F. App'x 896, 899 (10th Cir. 2020) (reiterating that under *Manzanares*, the New Mexico crime of felony aggravated battery is a violent felony for purposes of the ACCA). And in Tenth Circuit cases considering statutes with similar or almost identical language to N.M. Stat. Ann. § 30-3-5(C), those felonies too are considered violent felonies. *See United States v. Maldonado-Palma*, 839 F.3d 1244, 1250 (10th Cir. 2016) (finding NMSA § 30-3-2A aggravated assault with a deadly weapon satisfies the elements clause as a violent felony); *United States v. Pacheco*, 730 F. App'x. 604, 609 (10th Cir. 2018) (unpublished) (finding NMSA § 30-3-16(C) aggravated battery against a household member with a deadly weapon satisfies the elements clause as a violent felony).

Further, Mr. Gonzales was not convicted under the language that he claims is ambiguous. The judgment, properly provided under *Shepard*, shows that Mr. Gonzales was convicted of Aggravated Battery with a Deadly Weapon under § 30-3-5(C), not simply "Aggravated Battery"

7

or "Aggravated Battery in Any Manner Whereby Great Bodily Harm or Death Can Be Inflicted." Doc. 61-3.  In order to prove Aggravated Battery with a Deadly Weapon, the state must prove the existence of a deadly weapon.  Doc. 61-1; *United States v. Titties*, 852 F.3rd 1257, 1266 (10th Cir. 2017) (use of consulting jury instructions).

In sum, Mr. Gonzales was convicted of Aggravated Battery with a Deadly Weapon, which is a felony under § 30-3-5(C).  The Tenth Circuit has held that this offense is categorically a "violent felony."  Mr. Gonzales's arguments regarding the language of Subsection (C) are foreclosed both because he was specifically convicted of having a deadly weapon and because of binding Tenth Circuit precedent.  Accordingly, Mr. Gonzales's 1996 conviction for Aggravated Battery with a Deadly Weapon under § 30-3-5 (A) & (C) constitutes a prior violent felony conviction for sentencing enhancement under ACCA.  Mr. Gonzales also has two convictions of Aggravated Assault with a Deadly Weapon, and he is consequently an armed career criminal subject to an enhanced sentence under § 924(e).  Accordingly, Mr. Gonzales's objection should be **OVERRULED**, and the enhancement is applicable.

The offense level is **31**, and the criminal history category is **VI**.  Mr. Gonzales's advisory guideline imprisonment range of imprisonment is therefore 188 to 235 months.  However, since the ACCA applies, Mr. Gonzales is subject to a mandatory term of 180 months of imprisonment and a maximum term of life imprisonment.  The Government requests a sentence of at least 180 months, pursuant to the parties' Rule 11(c)(1)(B) agreement.  Probation recommends a sentence of 180 months pursuant to the ACCA enhancement, as well as supervised release for 5 years.  Doc. 42 at 1.  The Government also requests a sentence of at least 180 months pursuant to the ACCA enhancement.  Doc. 54 at 1.  Mr. Gonzales requests a sentence of 108–120 months, arguing that the ACCA should not apply.  Docs. 43 at 8, 54 at 5, 60 at 22.  He did not request a sentence

pursuant to the Court's application of the Armed Career Criminal enhancement. *Id.*

In addition to the Sentencing Guidelines, this Court also considers the other factors set forth in 18 U.S.C. § 3553(a). That section requires the Court to consider the nature and circumstances of the offense and the history and characteristics of Mr. Gonzales. *See* § 3553(a). It also requires the Court to impose a sentence that complies with the purposes of sentencing, which include (1) retribution, (2) deterrence, (3) incapacitation, and (4) rehabilitation. *Id.* In satisfying these purposes, the Court is obligated to consider each of the factors outlined in § 3553(a). The Court has considered each of those factors.

**As to the nature and circumstances of the offense:**

The events of this case took place on August 20, 2018, when Mr. Gonzales shot his cousin M.H. with a stolen pistol after a verbal and physical altercation after M.H. attacked their family members. Doc. 41 at ¶ 27. Around 3:45 A.M. on August 20, M.H. arrived at Mr. Gonzales's residence in a stolen Toyota Highlander. *Id.* at ¶ 13. The residence belongs to Mr. Gonzales's mother, Sara Gonzales, and he lived there with his mother, his brother Larry Ambrose Gonzales, and his aunt Yvonne Gurule. *Id.* at ¶ 69. Ms. Gurule is the mother of M.H. *Id.* Christina Porteous was also living at the residence at the time. *Id.* at 16. Surveillance footage from a DVR system confirmed the timing and the events as described. *Id.* at ¶ 22.

When M.H. arrived at Mr. Gonzales's residence, he informed Mr. Gonzales that he "had just killed someone" and that he was running low on bullets for his .32 caliber handgun. Doc. 41 at ¶ 13. Sara Gonzales indicated that M.H. was "under the influence of drugs and was schizophrenic" at the time. *See* Sara Gonzales's Letter of Support at 1. M.H. asked to borrow Mr. Gonzales's 9mm handgun, but Mr. Gonzales refused because M.H. "was up to no good." *Id.* at ¶¶ 13, 25. This refusal greatly upset M.H., and the two entered a verbal and physical altercation.

*Id.*  M.H. became physically abusive to his family members.  *See* Sara Gonzales's Letter of Support at 1.  Ms. Gonzales indicated that M.H. was beating his mother, Ms. Gurule, and that he pushed his 80-year-old grandmother down into a flower bush.  *Id.*  While Ms. Gurule was on the ground, M.H. "picked up a large brick ready to hit [her] … he would've killed her."  *Id.*  Mr. Gonzales noted that M.H. was beating up Ms. Gurule "like a man beats another man" and that he "got the brick and was gonna smash her head in."  Doc. 52 at 12.

Mr. Gonzales and M.H. physically fought in the driveway of the residence, in the driver's side door of a Toyota Highlander, and in the street.  *Id.* at ¶ 22.  M.H. got back into the driver seat of the vehicle, and Sara Gonzales stepped in between him and Mr. Gonzales.  *Id.*  Mr. Gonzales said that the argument ended when M.H. threatened him with a shotgun.  *Id.* at ¶ 13.  Sara Gonzales deescalated the situation and advised M.H. to put the gun away.  *Id.* at ¶ 18.  She and  Mr. Gonzales then went back into the residence, and M.H. left in the Toyota Highlander at 3:54 A.M.  *Id.* at ¶ 22.

At 4:19 A.M., about 25 minutes after leaving, M.H. returned to Mr. Gonzales's residence. Doc. 41 at ¶ 22.  He exited his vehicle wearing gloves and began to ring the doorbell repeatedly. *Id.* at ¶¶ 22, 14.  Mr. Gonzales grabbed his 9mm handgun, which had one bullet in the chamber and did not have a magazine, and he put it in his front waistband for protection.  *Id.* at ¶ 14.  He and M.H. continued to argue, and M.H. pulled out his .32 caliber pistol and pointed it at Mr. Gonzales.  *Id.*  Mr. Gonzales, in turn, pulled his 9mm handgun from his waistband and shot M.H. once.  *Id.*  M.H. dropped to the ground.  *Id.*  Mr. Gonzales entered his bedroom to retrieve his car keys and gave both his gun and M.H.'s gun to Christina Porteous, who placed the weapons in a trashcan located on an outside second-story patio.  Doc. 41 at ¶¶ 14, 16.  At 4:22 A.M., Mr. Gonzales was seen on the surveillance camera dragging M.H.'s limp body into the passenger seat

of his vehicle, a Cadillac.  *Id*. at ¶ 22.  It took Mr. Gonzales "some time" to get M.H. into the vehicle.  *Id*.  At 4:24 A.M., Mr. Gonzales drove away from the residence in the Cadillac with M.H. in the passenger seat.  *Id*.  Around 4:22 A.M., Mr. Gonzales's brother Larry Gonzales called 911 and reported that Mr. Gonzales had shot M.H. and was taking him to the hospital.  Doc. 41 at ¶ 11. Larry Gonzales reported going outside after M.H. was shot and seeing him "lying in the driveway moaning."  *Id*. at ¶ 17.

Mr. Gonzales dropped M.H. off at the emergency entrance to the Sandoval Regional Medical Center.  *Id*. at 14.  M.H. was pronounced deceased upon arrival at the medical center.  *Id* at ¶ 15.  There was no attempt to resuscitate him, as he was pulseless and apneic with fixed and dilated pupils and no electrocardiogram activity.  *Id*.

The Rio Rancho Police Department (RRPD) responded to the Gonzales residence to investigate the incident at 4:42 A.M.  *Id*. at ¶ 22.  RRPD also contacted area law enforcement to look for Mr. Gonzales and his vehicle.  *Id*. at ¶ 12.  Shortly after Mr. Gonzales dropped M.H. at the hospital, deputies with the Sandoval County Sheriff's Office conducted a traffic stop of Mr. Gonzales and detained him after observing that he and his vehicle were covered in blood.  *Id*.  Mr. Gonzales was taken to the RRPD station, where he was advised of his *Miranda* rights and agreed to give a statement without the presence of an attorney.  *Id*. at ¶ 13.

Mr. Gonzales told detectives that at the time of the shooting, M.H. was turned sideways from him.  Doc. 41 at ¶ 14.  Mr. Gonzales stated that M.H. drew his handgun out of his right pocket with his right hand, simultaneously lifting his left arm.  *Id*.  Mr. Gonzales could not recall where he shot M.H. or how he held his 9mm when shooting.  *Id*.  The Office of the Medical Examiner autopsy report indicated that M.H. had a gunshot wound on his right arm and chest: the bullet entered his right arm, exited into his armpit, reentered his right chest, and exited through his left

chest.  *Id.* at ¶ 24.  The bullet perforated both of M.H.'s lungs and passed behind his heart, rupturing his aorta and pulmonary artery.  *Id.*  This path of travel was not consistent with Mr. Gonzales's statements about M.H. standing with his left arm outstretched toward him, but it does confirm that M.H. was facing sideways to Mr. Gonzales when he was shot.  *Id.*

After a search warrant was executed at Mr. Gonzales's residence, the following weapons were seized: (1) a black Taurus PT111 Millennium G2 9mm pistol, located at the bottom of a full trashcan on the second-story outdoor balcony; (2) a silver Savage model 1907 pistol, also located at the bottom of the trashcan on the balcony; (3) a Remington RAG 1907-15 brown bolt action rifle; (4) brass knuckles located in Mr. Gonzales's bedroom; (5) a spray-painted black .22 caliber tube loading rifle; and (6) miscellaneous ammunition located in Mr. Gonzales's closet.  Doc. 41 at ¶ 19.  Various cell phones, three digital scales, and a syringe containing a small amount of a black liquid substance presumed to be heroin were also seized pursuant to the search.  *Id.*

Ten days after the shooting, on August 30, 2018, Mr. Gonzales arrived at the RRPD station to retrieve his vehicle and agreed to speak to an FBI agent and RPPD detective.  *Id.* at ¶ 25.  Mr. Gonzales stated that the firearms belonging to him were the black Taurus 9mm pistol, the French-made Remington rifle, and the .22 caliber rifle.  *Id.* at ¶ 26.  He reported buying the French rifle for $100 and trading bicycle parts for the .22 caliber rifle.  *Id.*  Mr. Gonzales purchased the 9mm pistol in June or July 2018 for $100 from an unknown male "on the streets" who was "down on his luck and needing money."  *Id.*  Mr. Gonzales stated that he did not know the 9mm had been stolen and claimed to be under the impression that he could lawfully possess a firearm because he was no longer on parole.  *Id.*  He also noted that his possession of the firearms was related to his cousin because he knew M.H. "had an arsenal of guns" and was concerned that M.H. would soon pull one of the weapons on him.  Doc. 52 at 13.

When Mr. Gonzales reflected on the circumstances of the instant offense on August 20, 2018, he felt sad, noting "It was my first cousin … I didn't want to kill him. I loved him. I practically helped raise him. He was my younger cousin." Doc. 52 at 12. Mr. Gonzales stated that after M.H. was released from prison, "he wasn't the same person anymore." *Id.* He said that M.H. experienced extreme paranoia, "thinking everyone was out to get him and killing people left and right." *Id.* Regarding the shooting, Mr. Gonzales stated that "there was no way around it" because M.H. was determined to shoot him and to continue attacking their family members. Mr. Gonzales indicated that M.H. was on methamphetamine and was "not in the right mind at all." *Id.* Mr. Gonzales felt that M.H. had returned to the home a second time "for blood," noting that M.H. "came back with gloves and everything." *Id.*

**As to the history and characteristics of Mr. Gonzales**:

He is 44 years old. Doc. 41 at 2. He was born in Albuquerque to Sara Gonzales, age 67, and Larry Gonzales, who passed away from cirrhosis (liver damage) in 2004. *Id.* at ¶ 66. His mother resides in Rio Rancho and is currently unemployed. *Id.* She survived breast cancer, and her health continues to be "up and down." *Id.* Mr. Gonzales has one brother, Larry Ambrose Gonzales, age 48, who is also unemployed and is receiving treatment for alcoholism. *Id.* at ¶ 66. Prior to the instant offense, Mr. Gonzales lived with his brother in his mother's home. *Id.* Mr. Gonzales's maternal aunt, Yvonne Gurule, also resides in the home. *Id.*

Mr. Gonzales initially reported that he had a normal childhood, without abuse or harsh discipline. Doc. 41 at ¶ 68. However, his mother notes that his childhood was difficult because of his father's alcoholism. *Id.* Ms. Gonzales reported that Mr. Gonzales Sr. was verbally abusive to her and to their children. *Id.* Mr. Gonzales confirmed this abuse in his psychological evaluation with Julie M. Brovko, Ph.D. [Doc. 52]. Mr. Gonzales's parents were constantly fighting over

money, and although he was not exposed to domestic violence, his home was frequently filled with arguing and yelling. Doc. 52 at 5. His father was a bad alcoholic, and Mr. Gonzales Sr.'s personality switched from "funny" to "angry drunk" when he came home from drinking. *Id*. Mr. Gonzales's parents eventually divorced, although his mother continued to be present for his father when he was hospitalized and at the time of his death. Doc. 41 at ¶ 66. In addition to his father's alcoholism, Mr. Gonzales also experienced physical abuse at the hands of his older brother. Doc. 52 at 4. Larry Gonzales would beat up Mr. Gonzales, including one incident where Mr. Gonzales was shoved into a dryer and the machine was then turned on. *Id*. Larry Gonzales would also push Mr. Gonzales's tricycle or bicycle down a hill and into a ditch. *Id*. This abuse resulted in numerous injuries throughout his childhood. *Id*.

Mr. Gonzales has resided in the Albuquerque and Rio Rancho areas for much of his life, excepting a five-month period in 1999 and 2000 in which he moved to Mesa, Arizona to experience a new place. Doc. 41 at ¶ 67. However, he did not always live with his parents: at age 14 or 15, he moved into his grandmother's home because of his brother's abuse, his parents' fighting, and feeling "real upset with life." Doc. 52 at 4. Mr. Gonzales also reported that he was homeless for a period of time as a teenager, bouncing between his friends' houses. *Id*. at 5. When Mr. Gonzales was a teen, he was involved in a neighborhood gang. *Id*. at 5. He was active in the gang from age 15 or 16 until his 20s and witnessed a lot of gang-related violence. *Id*. Mr. Gonzales saw individuals being assaulted and killed, and he was assaulted himself on multiple occasions. *Id*.

Mr. Gonzales's mother remains very supportive of him, and he wishes to return to her residence following his release from custody. Doc. 41 at ¶ 69. His mother would welcome him back in her home, which is the site where the instant offense occurred. *Id*. It is of note that Mr. Gonzales's aunt Yvonne Gurule still resides there; Ms. Gurule is the mother of M.H., and she and

Mr. Gonzales have not spoken since M.H. passed away.  *Id*.  Ms. Gonzales reported that Ms. Gurule does still love Mr. Gonzales.  *Id*.  Larry Gonzales also still resides in the home, and he has suffered from agoraphobia (an anxiety disorder involving fear of places or situations that could cause panic) since the instant offense.  *Id*.

Mr. Gonzales has never been married and has no biological children, though he has previously cared for his partners' children.  Doc. 52 at 6.  Mr. Gonzales has previously had three serious relationships.  He dated a woman named Andrea for five years "when he was a teenager." *Id.*  From 2013 through 2017, Mr. Gonzales was in a relationship with a woman named Doll.  *Id*. He stated that she "took too many pills" and that the couple was pregnant four times, but that each pregnancy ended with a miscarriage because of drug use.  *Id*.  The relationship ended after Mr. Gonzales overdosed on heroin, which substantially affected his ability to communicate and engage in conversations.  *Id*.  In the PSR, Christina Porteous is occasionally mentioned as a girlfriend of Mr. Gonzales; however, both he and his mother deny that Mr. Porteous was ever his romantic partner.  Doc. 41 at ¶ 71; Doc. 52 at 7.  Currently, Mr. Gonzales is in a relationship with a woman named Amanda, whom he met through mutual friends.  Doc. 52 at 6.  He describes her as a good influence who stays away from drugs and alcohol.  *Id*. at 7.  However, the pair have had difficulties staying in contact during his incarceration, and as of June 2020 Mr. Gonzales seemed "uncertain regarding the status of their relationship."  *Id*.

As to education, Mr. Gonzales's highest grade completed was ninth grade, and he received his GED while incarcerated in 2008.  Doc. 41 at ¶ 68; Doc. 52 at 5.  He repeated the ninth grade twice and received special education services for a behavioral disorder beginning in fourth grade. Doc. 52 at 5.  Mr. Gonzales had problems with his teachers and with bullies throughout his schooling experience.  He noted that he was a smart kid, but that he felt picked on by his teachers.

Doc. 41 at ¶ 69.  He dealt with bullies starting in kindergarten, and by the time he was in high school he had been in trouble for fighting "too many [times] to count."  Doc. 52 at 5.  Mr. Gonzales would try to protect other children from being bullied as well.  *Id*.  He was expelled in ninth grade for fighting, and he reported that he was "kicked out" of Albuquerque Public Schools.  *Id*.

As to employment, Mr. Gonzales has intermittently been employed, interrupted by periods of incarceration.  Doc. 52 at 6.  He previously worked at a cabinet factory for approximately two years in the 1990s and as a foreman for a tile company.  Doc. 41 at ¶ 87; Doc. 52 at 6.  His mother indicated that he also worked at Jiffy Lube.  Doc. 41 at ¶ 87.  Mr. Gonzales began receiving disability benefits in 2011 for depression and Post-Traumatic Stress Disorder ("PTSD").  *Id*. at ¶ 86.  He also indicated supplemental security income benefits beginning in 2013 following an anoxic brain injury.  Doc. 52 at 6.  The benefits ceased in August 2018 due to his incarceration in this case.  Doc. 41 at ¶ 86.

Mr. Gonzales has had various medical injuries and hospitalizations.  He has been diagnosed with Hepatitis C, but he denies complications.  Doc. 52 at 7.  Mr. Gonzales has also been diagnosed with Type II Diabetes.  *Id*.  He has subclinical hypothyroidism and class 2 severe obesity.  *Id*.  He had an appendectomy in 2011 and a repair of an umbilical hernia in 2005.  *Id*.  Mr. Gonzales has suffered various car and motorcycle accidents and had a number of skin grafts for a 2017 motorcycle burn injury on his leg.  *Id*.; Doc. 41 at ¶ 72.  He has back, ankle, and shoulder pain from motorcycle accidents in 2014 and 2015.  *Id*. at 73.  Additionally, Mr. Gonzales was hospitalized on July 22, 2019 to treat a venous stasis secondary to a necrotizing fasciitis (an infection known as "flesh-eating disease").  Doc. 41 at ¶ 72.  He also developed acute respiratory distress syndrome and acute tubular necrosis (a kidney disorder) and required dialysis.  *Id*. at ¶ 73.  In April 2018, he was treated in an emergency room when a hypodermic needle broke in his arm

after injecting Suboxone. *Id*. at ¶ 74. In May 2018 he was treated for a stab wound to his right thigh. *Id*.

Throughout his life, Mr. Gonzales has also struggled with substance abuse. He used cannabis beginning at age 13, methamphetamine beginning in his teenage years, and prescription opioids beginning in his 20s. Doc. 52 at 11. He started to abuse prescription opioid medication when he developed necrotizing fasciitis because "his pain would not subside." *Id*. He then became addicted to heroin because he couldn't afford the opioids and it was "the next best thing." *Id*. Mr. Gonzales stated that heroin helped take away his pain. *Id*. Mr. Gonzales has overdosed on heroin multiple times: He first overdosed on heroin in 2013 and was hospitalized in coma for two and a half weeks. Doc. 52 at 7. He overdosed on heroin again in 2014 and was hospitalized for 15 days. As a result, he suffered an anoxic brain injury, aspiration pneumonia, septic shock, and PTSD. Doc. 41 at ¶ 81. Following his overdoses, Mr. Gonzales has had difficulty with his thinking and his memory, as well as with communicating with others. Doc. 52 at 7. His mother stated that he "never fully returned to the person he used to be." *Id*. Mr. Gonzales overdosed on heroin again in October 2016; he was treated with Narcan and was uncooperative with hospital staff requesting information regarding the overdose. On October 29, 2018, he was taken to the emergency for a possible drug intoxication which responded to Narcan. *Id.*

As to his mental and emotional health, Mr. Gonzales has previously been diagnosed with PTSD, intermittent explosive disorder, schizophrenia, depression, and bipolar disorder. Doc. 52 at 8. He also has a history of an anxiety disorder and attention deficit hyperactivity disorder (ADHD). *Id*. He has previously been proscribed Buspar, Wellbutrin, Prozac, duloxetine, lithium carbonate, and mirtazapine. *Id*. at 10.

Mr. Gonzales began feeling depressed at age fourteen and has previously attempted suicide

multiple times between the ages of 15 and 35.  *Id*. at 8.  In 2013, while in custody of the New

Mexico Department of Corrections (NMDOC), he was diagnosed with a psychosis disorder, mood

disorder, and amphetamine dependence.  Doc. 41 at ¶ 77.  During his 2013 clinical assessment, he

also reported being sexually abused by two strangers on two occasions.  *Id*.  In 2014, Rex. E. Jung,

Ph.D. performed a Neuropsychological Evaluation on Mr. Gonzales to determine his current

degree of cognitive functioning and to assess whether or how his cognitive functioning had

declined following an anoxic brain injury from a drug overdose.  *Id.* at ¶ 79.  Dr. Jung noted that

Mr. Gonzales's neuropsychological performance was consistent with his diagnosis of anoxic brain

dysfunction.  *Id*.  Mr. Gonzales had difficulty with divided attention, memory retrieval, and frontal

lobe executive functioning.  *Id.*  Dr. Jung indicated that Mr. Gonzales's cognitive difficulties would

be persistent, and that rehabilitation was necessary to utilize his relative strengths to overcome

what would likely be permanent weaknesses.  *Id.*  Dr. Jung also noted that Mr. Gonzales has a

longstanding history of PTSD, for which medical marijuana was a significant benefit.  *Id.*

In an evaluation from August 2020 with Julie M. Brovko, Ph.D., Mr. Gonzales stated that

he has not recently had suicidal ideation or attempts.  Doc. 52 at 8.  He continues to struggle with

reminders of past traumatic events, including the abuse from his older brother, his frequent fights,

gang violence, and car and motorcycle accidents.  *Id*.  He has difficulty sleeping due to anxious

thoughts, including frequent worrying about his mother.  *Id*.  Mr. Gonzales also feels depressed

when he is alone and especially at nights.  *Id.*  He has struggled with feelings of isolation due to

issues with his memory and thinking, as well as difficulties conversing with others.  He noted that

he cannot remember people's names and has difficulty remembering past events since his first

heroin overdose in 2013.  *Id.*  Regarding his history of traumatic events, Mr. Gonzales reported

experiencing "déjà vu" when reminded of past incidents.  *Id.*  He feels uneasy about his

whereabouts and anxious.  His heart rate increases and he experiences a persistent negative mood.  Mr. Gonzales also said that he feels irritable and angry at times, especially "when you put my loved ones in danger."  *Id.* at 9.  Dr. Brovko noted that Mr. Gonzales appears to overestimate danger in situations that may appear neutral to others, reflecting exaggerated negative beliefs about others and hypervigilance.  *Id.* at 10.

Dr. Brovko diagnosed Mr. Gonzales with cannabis use disorder (moderate), opioid use disorder (moderate), generalized anxiety disorder, unspecified trauma and stressor-related disorder, and antisocial personality disorder.  Doc. 52 at 18.  However, she noted that the antisocial personality disorder symptoms overlap significantly with trauma disorder symptoms.  *Id.*  She noted that Mr. Gonzales has a history of engaging in reckless or self-destructive behavior, starting from his childhood.  *Id.* at 19.

Research suggests individuals such as Mr. Gonzales who experience multiple traumatic events (for example, assaultive violence and exposure to community violence) in childhood have an increased incidence of conduct disorder and antisocial behaviors.  *Id.*  Early trauma, such as Mr. Gonzales's physical abuse at the hands of his brother, can result in the development of aggressive and reckless behavior when a child is not taught appropriate coping skills.  *Id.* This reckless behavior exposes the individual to additional trauma such as gang violence, which in turn can exacerbate existing symptoms of trauma.  *Id.*  Dr. Brovko noted that Mr. Gonzales's antisocial behavior is likely better explained by his exposure to traumatic events across childhood, adolescence, and adulthood, and his subsequent development of trauma symptoms.  *Id.* at 20.

Mr. Gonzales also has experienced chronic pain, and Dr. Brovko informed that studies have identified reciprocal relationships between chronic pain, long-term opioid use, and PTSD: Patients with chronic pain who experience trauma symptoms report higher levels of pain.  Doc. 52

at 26.  Long-term opioid use has been found to lead to altered pain perception and lowered pain tolerance.  *Id.*  Thus, Mr. Gonzales's trauma symptoms likely contributed to a lower pain tolerance, which, in response to the necrotizing fasciitis and the subsequent chronic pain, likely contributed to an increase in opioid use leading to further alterations in pain perception.  *Id.*  Dr. Brovko indicated that common developmental factors leading to PTSD and opioid use disorder may include biological factors, but also include certain psychological traits such as impulsivity and poor coping skills, as well as environmental factors including trauma exposure, lack of caregiver support, and drug availability.  *Id.*

Research suggests that the co-occurrence of trauma disorders and substance use disorders is as high as 55% among adult male inmates.  Doc. 52 at 23.  One explanation for the high rates of co-occurrence is that substances are used to "self-medicate" in order to cope with the distress that arises from trauma exposure.  *Id.*  Another explanation is that individuals who use substances are more likely to experience trauma due to high-risk lifestyles—such as frequenting dangerous locations or selling drugs—and less likely to effectively cope with trauma, compared to people who do not use substances.  *Id.*  Dr. Brovko notes that research has found support for both theories, indicating that exposure to trauma and substance abuse exacerbate each other in a uniquely harmful manner that is best described as a vicious cycle.  *Id.*

Dr. Brovko reported that Mr. Gonzales has a history of complex trauma, not only due to his family environment and exposure to community violence as a child, but also his car and motorcycle accidents, and his continued exposure to violence as an adult.  *Id.* at 22.  She notes that Mr. Gonzales has a criminal history primarily characterized by violent offenses and a history of angry outbursts.  These outbursts have contributed to many, if not all, of his prior offenses, including this offense.  *Id.* at 24.  She reports that his outbursts are likely a manifestation of trauma

symptoms, low distress tolerance, and exaggerated responses to stress.  *Id.*  Dr. Brovko identifies

the vicious cycle at play: First, childhood trauma may lead to PTSD or substance abuse disorder.

Then, substance abuse and trauma disorders may lead to criminal behavior.  *Id.*  Next, a criminal

lifestyle and subsequent incarceration increases the risk of further trauma.  *Id.*  For Mr. Gonzales,

his difficulty in reasoning, planning, and controlling his impulses was likely exacerbated by his

deficits in executive functioning resulting from his brain injury after his overdose.  *Id.*

Regarding Mr. Gonzales's history of anxiety and his low mood symptoms, Dr. Brovko

stated that these symptoms are best characterized as a manifestation of trauma-related disorder.

Doc. 52 at 25.  Research suggests that individuals with difficulties in emotion regulation and

distress tolerance tend to have trouble tolerating negative emotional distress.  *Id.*  Accordingly,

they may be especially reactive to trauma-related cues and more likely to engage in strategies like

violence and substance use in an attempt to avoid distressing negative emotional states triggered

by trauma-related cues.  *Id.*  These individuals may also demonstrate deficits in impulse control.

For Mr. Gonzales, confrontation with trauma-related cues has resulted in instances of explosive

anger, which has led to assaults and his subsequent incarceration.  *Id.*

Dr. Brovko reported that Mr. Gonzales has had little, if any, intervention to target his

substance abuse, trauma, or other psychiatric symptoms.  Doc. 52 at 25.  He has never had

substance abuse treatment, but he believes that drug rehabilitation would be helpful.  *Id.* at 11.  Mr.

Gonzales stated that even though he has overdosed, he keeps using, and he remarked that if he "got

away from that needle, [he would] be alright."  *Id.*  Because trauma and substance abuse disorders

function reciprocally and tend to exacerbate each other, research suggests that they can be treated

concurrently.  Dr. Brovko noted that Mr. Gonzales's experience of chronic pain must be considered

in the context of his treatment, as chronic pain increases one's likelihood of relapse to opioid

medication.  *Id.* at 27.

Dr. Brovko also notes that research has shown social support to be critical for individuals recovering from trauma.  *Id.*  While social isolation exacerbates trauma symptoms, supportive social networks help individuals cope with stressful events.  Mr. Gonzales continues to be supported by his mother, who expressed in her letter of support to the Court that she will always be there for her son.  Ms. Gonzales is dedicated to continuing to visit Mr. Gonzales and wishes that he will be as close to home as possible.  *See* Sara Gonzales's Letter of Support at 1.

**With respect to the need for the sentence imposed to reflect the seriousness of the offense, to promote respect for the law, to provide just punishment for the offense, and to promote public safety:**

The instant offense was violent and very serious.  Mr. Gonzales's possession of a firearm caused deadly harm to M.H. and presented a danger to those around him and in his neighborhood. The incident damaged Mr. Gonzales's family, who lost a loved one that evening. However, the violence of the offense is necessarily mitigated by the fact that Mr. Gonzales acted to protect himself, his aunt, his grandmother, and other individuals who were present when M.H. reappeared in the middle of the night with a dangerous weapon.

**With respect to deterrence:**

Mr. Gonzales's criminal history is extensive.  He received six criminal history points, and because he is an armed career criminal his Criminal History Category is **IV**.  Doc. 41 at ¶ 55.  Mr. Gonzales's first conviction came at the age of 19, when he was convicted of Aggravated Battery with a Deadly Weapon.  *Id.* at ¶ 48. The indictment charged him with one count of touching or applying force to L.C. with an exacto knife intending to injure, and one count of touching or applying force to L.C. causing great bodily harm.  *Id.*  Mr. Gonzales received a sentence of 3 years of supervised probation, and in 1998 his probation was revoked and he served 228 days in custody.

*Id.*  At age 22 in 1998, Mr. Gonzales was convicted of Attempted Unlawful Taking of a Motor Vehicle and of Resisting, Evading, or Obstructing an Officer.  *Id.* at ¶ 49 The incident involved forcibly taking a vehicle from A.G. and then refusing to obey an officer's commands to stop his vehicle.  Officers used a spike strip to stop the vehicle, and Mr. Gonzales fled on foot.  *Id.*  Also at 22 in 1999, he was convicted of Battery on a Police Officer for touching or applying force in a rude, insolent manner to a peace officer in February 1998.  *Id.* at ¶ 50.

At age 26 in 2004, Mr. Gonzales was convicted of two counts of Aggravated Assault with a Deadly Weapon, one with a firearm enhancement.  *Id.* at ¶¶ 51–52. On April 13, 2002, Mr. Gonzales struck R.F. in the face multiple times with a fist and later that day pointed a revolver at multiple people outside of R.F.'s home.  *Id.*  On September 21, 2002, he was asked to leave a residence  following an argument with his girlfriend; he then drove his vehicle into the residence through the living room, nearly hitting R.H.  *Id.*  When approached by officers, he pointed a boxcutter at officers and then placed it on his own throat, threatening suicide.  The two cases were consolidated and he was sentenced to nine years less one day.  *Id.*  In 2012, his probation was revoked after he incurred new criminal charges and he was sentenced to 1,552 days in custody with a 2-year parole term following his release.  *Id.*

Mr. Gonzales has also had arrests that have not resulted in convictions.  These arrests are for offenses including Breaking and Entering, Aggravated Battery, Criminal Damage to Property, Resisting/Evading/Obstructing an Officer, Battery Against a Household Member, Aggravated Battery (Great Bodily Harm), Embezzlement, Assault, Aggravated Burglary with a Deadly Weapon, Aggravated Assault with a Deadly Weapon, Possession of a Firearm, Use or Possession of Drug Paraphernalia, Receiving Stolen Property, and Trafficking Controlled Substances.  Doc. 41 at ¶¶ 58–64.

Finally, Mr. Gonzales's other criminal conduct involves an incident on December 27, 2019, when a detention officer at Cibola County Correctional Center witnessed Mr. Gonzales retrieving a pill from under a cell door.  Doc. 41 at ¶ 56.  Mr. Gonzales was asked for the pill, which was a yellow substance in a clear capsule, but Mr. Gonzales took the pill instead.  *Id.*  He has also had misconduct reports for tampering with locks and security items and has previously refused psychiatric medication and treatment plans.  *Id.* at ¶ 80.

**Finally, with respect to rehabilitation:**

Mr. Gonzales is in need of treatment for both his substance abuse and mental health disorders.   Mr. Gonzales should receive best-practice, empirically supported treatment to comprehensively address his psychiatric concerns.  His treatment should aim to target his co-occurring trauma and stressor-related disorder and his substance abuse disorder diagnoses foremost.  Mr. Gonzales's treatment should also monitor and address his anxiety symptoms and other psychological concerns, and he should closely be monitored for any thoughts of suicidality. Additionally, Mr. Gonzales should have a consultation with a physician to better monitor his Type II diabetes, his blood sugar, and his other physical health conditions.

## CONCLUSION

On the whole, Mr. Gonzales's actions in this case were very serious, and his possession of a firearm resulted in the death of his cousin.  His criminal history is also very concerning and reflects a man who has at times been out of control.  The Court ultimately believes, however, that much of Mr. Gonzales's criminal behavior has been a product of his longstanding substance abuse and addictions and his unresolved traumas.  In a state of addiction, he has been unpredictable and a danger to those around him.

To address Mr. Gonazles's behavior in this case and his pattern of recidivism, then, the Court must address his addictions. The problems that led to the instant case will not be solved by sending him to prison for fifteen years, but the ACCA binds the Court's hands in sentencing. Treatment to target Mr. Gonzales's co-occurring trauma and stressor-related disorder and his substance abuse disorder is necessary to help him confront the painful things in his life so he can move beyond them. It is extremely unfortunate that Mr. Gonzales is subject to a mandatory minimum of 15 years of imprisonment in the Bureau of Prisons, where he is unlikely to receive the level of treatment he so desperately needs. While incarcerated, Mr. Gonzales should be given the opportunity to participate in any available mental health and substance abuse counseling, and he must be given the opportunity to consult with a physician so that his Type II diabetes and other physical health conditions do not worsen during his imprisonment.

Bound by 18 U.S.C. § 924(e), the Court sentenced Mr. Gonzales to imprisonment for a term of 180 months. Doc. 67 at 1. The Court also imposed two years of supervised release and ordered Mr. Gonzales to comply with a number of special conditions aimed at helping him overcome his addictions and start building the tools he needs to live a productive, law-abiding life. *Id.* More detail on those conditions of supervision can be found in the criminal judgment in this case. *Id.*

Dated this 5th day of March, 2021.

_____
MARTHA VAZQUEZ
UNITED STATES DISTRICT JUDGE